# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

ROBERT O. MARSHALL,

             Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

           Defendant.

Case No. 4:16-cv-00012-SLG

## DECISION AND ORDER

Robert Marshall filed an application for Disability Insurance Benefits ("disability benefits") under Title II of the Social Security Act ("the Act"), alleging disability beginning November 26, 2009.[1] Mr. Marshall has exhausted his administrative remedies and seeks relief from this Court.[2] He argues that the determination by the Commissioner of the Social Security Administration ("Commissioner") that he is not disabled, within the meaning of the Act, is not supported by substantial evidence and that the Administrative Law Judge ("ALJ") committed legal errors.[3] Mr. Marshall asks for a reversal of the Commissioner's decision and a remand for calculation of benefits.[4]

---

[1] Administrative Record ("A.R.") 11, 222; *see also* Docket No. 10 at 2.

[2] Docket Nos. 10 at 1; 11 at 3; A.R. 1.

[3] Docket No. 1.

[4] Docket Nos. 1 at 2; 10 at 23. Alternatively, Mr. Marshall requests a remand for further proceedings with instructions. *Id.*

The Commissioner filed an answer to the complaint and an answering brief in opposition.[5]  Oral argument was not requested and was not necessary to the Court's decision.  For the reasons set forth below, Mr. Marshall's Motion for Remand at **Docket 1** is **GRANTED IN PART**, the Commissioner's final decision is **VACATED,** and the case is **REMANDED** to the Commissioner for further proceedings consistent with this decision.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[6]  "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[8]  In making its determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.[9]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[10]

---

[5] Docket Nos. 18; 11 respectively.

[6] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[7] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[8] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[9] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[10] *Gallant v. Heckler*, 753 F.2d 1450, 1452–53 (9th Cir. 1984).

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[11]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[12]

 The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[13]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[14]  A claimant bears the burden of proof at steps one through four in order to make a *prima facie* showing of disability[15]  If a claimant establishes a *prima facie* case, the burden of proof then shifts to the agency at step five.[16]  The

---

[11] 42 U.S.C. § 423(a) (2012).

[12] 42 U.S.C. § 423(d)(1)(A).

[13] 42 U.S.C. § 423(d)(2)(A).

[14] 20 C.F.R. § 404.1520(a)(4) (2014).

[15] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[16] *Treichler*, 775 F.3d at 1096 n.1.

Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, or (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. Pt. 404, Subpt. P, App. 2."[17]  The steps, and the ALJ's findings in this case, are as follows:

Step 1.  Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Mr. Marshall had not engaged in substantial gainful activity since November 26, 2009.*[18]

Step 2.  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities, and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.  *The ALJ determined that Mr. Marshall has the following severe impairments: osteoarthritis of the right knee (status-post total knee replacement), lumbar spondylosis, and obesity.*[19]  *The ALJ found that the following impairments were not severe: right wrist, elbow, and ankle impairments, left knee impairment, and depression.*[20]  *The ALJ also specifically found that the follow alleged impairments were not medically determinable: left shoulder/clavicle, bilateral wrist, and bilateral elbow, cervical spine, and prostatitis.*[21]

---

[17] *Id.* at 1099.

[18] A.R. 13.

[19] A.R. 13.

[20] A.R. 13–15.

[21] A.R. 15.

**Step 3.** Determine whether the impairment is the equivalent of any of the listed impairments found in 20 C.F.R. Pt. 404, Subpt. P, App. 1 that are so severe as to preclude substantial gainful activity. If the impairment is the equivalent of any of the listed impairments, and meets the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step. *The ALJ determined that Mr. Marshall does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.*[22]

Before proceeding to step four, a claimant's **residual functional capacity** ("RFC") is assessed.[23] Once determined, the RFC is used at both step four and step five.[24] An RFC assessment is a determination of what a claimant is able to do despite his or her physical, mental, or other limitations.[25] *The ALJ concluded that Mr. Marshall has the RFC to perform light work as defined in 20 CFR § 404.1567(b) except he is limited to frequent, not constant, operation of foot controls with the right lower extremity, occasional climbing of ramps and stairs as well as stopping, kneeling, crouching, and crawling; he must avoid concentrated exposure to non-weather related extreme cold and excessive vibration; and requires work that allows him to alternate sitting and standing positions at one hour intervals throughout the day for up to five minutes to relieve pain or discomfort.*[26]

---

[22] A.R. 15.

[23] 20 C.F.R. § 404.1520(a)(4) (2014).

[24] *Id.*

[25] 20 C.F.R. § 404.1545(a).

[26] A.R. 16–17.

**Step 4.** Determine whether the impairment prevents the claimant from performing work performed in the past. At this point, the analysis considers the claimant's RFC and past relevant work. If the claimant can still do his or her past relevant work, the claimant is deemed not to be disabled. Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that Mr. Marshall is unable to perform any of his past relevant work.*[27]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his or her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled. *Based on the testimony of a vocational expert ("VE"), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mr. Marshall can perform, including: assembler, DOT No. 706.684-022, and parking lot attendant, DOT No. 915.473-010.*[28]

### III.   PROCEDURAL AND FACTUAL BACKGROUND

Mr. Marshall is fifty-four years old. He worked as a pipe fitter and pipe welder for his adult life.[29] In 2007, he slipped off an iron beam and fell against a scaffold injuring his right knee.[30] On December 19, 2010, Mr. Marshall underwent a total knee replacement on his right knee after less severe treatment options—including three surgeries—were

---

[27] A.R. 22.

[28] A.R. 23–24. Both jobs are categorized as light, unskilled (SVP 2).

[29] A.R. 247, 674, 394, 267.

[30] A.R. 394.

unsuccessful at alleviating his pain.[31]  Mr. Marshall was found to have reached "maximum medical improvement" post-surgery on September 7, 2011.[32]  He was assessed at twenty-five percent whole body impairment related to his worker's compensation claim.[33]

In late 2013, Mr. Marshall was referred to a pain management specialist by his knee replacement surgeon.[34]  Through pain management, Mr. Marshall underwent multiple steroid injections in his lower back to relieve pain on his lumbar spine and was referred to both physical and psychological therapy.[35]  Mr. Marshall is prescribed diclofenac[36] and Wellbutrin,[37] and takes aspirin.[38]  He alleges the following combination of impairments: bilateral knees, bilateral wrists and elbows, depression, cervical and lumbar spine, left knee, right ankle, left shoulder/clavicle, and prostetis.[39]

---

[31] A.R. 323, 326.

[32] A.R. 334 (determination made by Doug Vermillion, M.D.).

[33] *See* A.R. 394 (Richard Cobden, M.D.).

[34] A.R. 572 (Oct. 21, 2013).

[35] AR. 752 (injection, July 23, 2014), 738 (injection, May 21, 2014), 698, 684 (initial physical therapy evaluations, Aug. 25 and 27, 2014 respectively), 680 (psychological pain management treatment summary letter, Oct. 24, 2014).

[36] Diclofenac is a nonsteroidal anti-inflammatory drug ("NSAID") and it works by stopping the body's production of a substance that causes pain, fever, and inflammation; https://medlineplus.gov/druginfo/meds/a689002.html (last visited Jan. 2, 2016).

[37] Wellbutrin (bupropion) is an antidepressant used to treat depression, seasonal affective disorder, and nicotine dependence; https://medlineplus.gov/druginfo/meds/a695033.html (last visited Jan. 2, 2016).

[38] A.R. 717.

[39] A.R. 72, 226, 36, 268.

The ALJ hearing was held on July 9, 2014; Mr. Marshall was represented by counsel at that hearing.[40]  The ALJ's decision was issued on September 4, 2014, and held that Mr. Marshall was not disabled from November 26, 2009 through the date of the decision.[41]  The Appeals Council declined to review the ALJ's disability determination on February 17, 2016.  As such, the ALJ's decision is the final decision of the Social Security Administration ("SSA").[42]  Mr. Marshall filed his complaint seeking judicial review with this Court on March 25, 2016;[43] he is represented by counsel in this appeal.[44]

## IV.    DISCUSSION

Mr. Marshall argues that the ALJ erred in: (1) rejecting the opinions of two of Mr. Marshall's treating sources as well as an examining source utilized by one of the treating sources; (2) finding Mr. Marshall's subjective complaints about the intensity, persistence, and limiting effects of his impairments to be not entirely credible; (3) rejecting the opinion of Mr. Marshall's wife; and (4) relying on the VE's testimony because it was based on a faulty hypothetical that did not include all of Mr. Marshall's restrictions.[45]  The Commissioner asserts that the ALJ did not err in any of these respects.

---

[40] A.R. 32.  There was also a brief hearing in April 2014, but that was continued by the ALJ because approximately 150 pages of additional evidence was filed right before the first hearing was scheduled to begin.  A.R. 68.

[41] A.R. 11.

[42] *Brewes v. Comm'r Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

[43] Docket No. 1.

[44] A.R. 33; Docket No. 10.

[45] Docket No. 10 at 11.

1.  <u>Weight of Medical Opinions</u>

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[46]  Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[47] Indeed, if the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record, that opinion will be given controlling weight.[48]  "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given."[49]  These factors include the length of the treatment relationship and frequency of examination as well as the nature and extent of the relationship.[50]

When weighing a medical opinion, including that of a treating source that is not controlling, the ALJ must consider the extent to which the opinion is supported by relevant evidence, such as medical signs and laboratory results; the extent to which an opinion is

---

[46] 20 C.F.R. §§ 404.1527(c), 416.927(c) (2014).

[47] *Garrison v. Colvin,* 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[48] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

[49] *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

[50] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

consistent with other opinions and evidence in the record; whether the opinion is within the source's area of specialization; and other factors such as the medical source's degree of familiarity with the SSA's disability progress and with other information in the claimant's record.[51]

Applying these factors means that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."[52] However, in some cases, the treating source's opinion may not be entitled to the greatest weight. But "an ALJ may reject a treating doctor's medical opinion," if no other doctor has contradicted it, "only for 'clear and convincing' reasons supported by substantial evidence."[53] In addition, the opinion of an examining, but non-treating source, should generally be given more weight than that of a non-examining source.[54]

Doctors do not always agree on all matters, and the ALJ is responsible for determining credibility and resolving conflicts and ambiguities in medical testimony.[55] But even when a treating source's opinion is contradicted by the opinion of an examining physician, a treating source's opinion is generally "still entitled to deference."[56] If a

---

[51] *See Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527).

[52] *Id.* at 632 (9th Cir. 2007) (citing "Giving Controlling Weight to Treating Source Med. Opinions," Social Security Ruling ("SSR") 96-2p, 1996 S.S.R. LEXIS 9, 1996 WL 374188 (July 2, 1996)).

[53] *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (citing *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir.1998)).

[54] *Garrison*, 759 F.3d at 1012 (citing *Ryan v. Comm'r Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

[55] *Lewis*, 236 F.3d at 509 (citing *Reddick,* 157 F.3d at 722).

[56] *Orn*, 495 F.3d at 633 (citing SSR 96-2p).

treating source's opinion is contradicted by another source, an ALJ may not reject that treating source's opinion without providing "specific and legitimate reasons supported by substantial evidence in the record."[57] This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."[58]

When an examining source relies on the same clinical findings as a treating source, but differs only in his or her conclusions, the conclusions of the examining source are not considered "substantial evidence" sufficient to support rejecting the treating source's opinion.[59] And when rejecting a treating source's opinions, the ALJ must do more than just offer his own conclusions; instead, "he must set forth his own interpretations and explain why they, rather than the doctors', are correct."[60] But an ALJ may discredit a treating source's opinions that are "conclusory, brief, and unsupported by the record as a whole or by objective medical findings."[61] The SSA also permits a claimant to provide evidence from non-physician sources to show the severity of an impairment and how it affects a claimant's ability to work, including evidence from a nurse practitioner, physicians' assistant, chiropractor, or therapist, including a physical therapist.[62]

---

[57] *Id.* (quoting *Reddick*, 157 F.3d at 725) (internal quotation marks omitted).

[58] *Reddick*, 157 F.3d at 725 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[59] *Orn*, 495 F.3d at 632.

[60] *Reddick*, 157 F.3d at 725 (citing *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988)).

[61] *Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)) (emphasis omitted).

[62] 20 C.F.R. §§ 404.1513(d), 416.913(d) (2014).

Here, four medical sources' opinions were discounted or rejected by the ALJ: (1) Doug Vermillion, M.D., an orthopedic surgeon; (2) Richard Cobden, M.D., an orthopedic doctor; (3) Jennifer Carlson, M.S.P.T. ("MSPT Carlson"), a physical therapist; and (4) Richard Elson, D.C., a chiropractor.[63] Mr. Marshall's appeal to this Court focuses on the ALJ's determinations with respect to the first three of these medical sources.

There are also four other treating sources whose medical opinions the ALJ did not expressly address:  Duane Frampton, a physician's assistant at an orthopedic office; Nancy Cross, M.D., a pain specialist; Randy Lewis, a licensed clinical social worker (LCSW Lewis); and Patrick Morgan, a physical therapist ("PT Morgan").  The medical records from Dr. Cross, LCSW Lewis, and PT Morgan were not a part of the administrative record that was before the ALJ.[64]  But the ALJ did know that Mr. Marshall had been seen by a pain management specialist—the ALJ refers to Dr. Cross' treatment notes from May 2014 discussing an April 2014 MRI in his written decision.[65]  Moreover, the medical records from Dr. Vermillion that were in the record before the ALJ indicate that the doctor referred Mr. Marshall to Dr. Cross in October 2013 due to recurrent pain.[66]  The Appeals Council had the records of these additional health care providers before it

---

[63] A.R. 20–21.

[64] *See* A.R. 69 (Exs. 1A–22F admitted into evidence at first ALJ hearing, April 2014); A.R. 33 (Exs.1A–25F admitted into evidence at the second ALJ hearing, July 9, 2014).  *But see A.R.* 13 ("The claimant's file includes medical exhibits 1F through 26F").  The A.R. before this Court includes all of those exhibits, plus Exs. 27F–32F, which contain nearly all of Dr. Cross's and PT Morgan's treatment notes as well as LCSW Lewis's treatment summary and opinion letter.

[65] A.R. 19.

[66] A.R. 570 (Ex. 17F).

when it made its decision to decline Mr. Marshall's request for review.[67]  Since these medical records were properly before the Appeals Council for its consideration, and came to the Court as part of the certified transcript encompassing the administrative record, the Court may consider them on appeal.[68]

*Dr. Vermillion, orthopedic surgeon*

Dr. Vermillion began treating Mr. Marshall on June 30, 2010, after he was referred by Dr. Keller for an opinion about Mr. Marshall's right knee.[69]  Dr. Vermillion promptly ordered x-rays and an MRI.  He diagnosed osteoarthritis and mild medial chondromalacia patella.[70]  He observed that the "MRI did show a 1-cm area of damage to the cartilage in the center of the patella and on the trochlea," which "appears to be the main source of his pain."[71]  On September 9, 2010, Dr. Vermillion performed a diagnostic arthroscopy and debridement of cartilage defects to Mr. Marshall's right knee.[72]  On October 18, 2010, in a preoperative discussion, Dr. Vermillion noted that Mr. Marshall's gait was antalgic and

---

[67] A.R. 4.

[68] *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (quoting *Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1162 (9th Cir. 2012) (holding that the administrative record includes evidence submitted to and considered by the Appeals Council)).

[69] A.R. 319.  Cary Keller, M.D., is an orthopedic surgeon who treated Mr. Marshall from at least Feb. 22, 2008, when the doctor performed surgery on Mr. Marshall's right knee.  A.R. 487.  Dr. Keller performed an additional surgery on Mr. Marshall's right knee on April 5, 2010.  A.R. 484.

[70] Chondromalacia patella is an abnormal softening of the cartilage of the underside of the knee cap, and is one of the most common causes of chronic knee pain.

[71] A.R. 318.

[72] A.R. 326.

that he had a large tear and cartilage defects in the medial portion of his knee.[73]

Accordingly, the following day, October 19, 2010, Dr. Vermillion performed a total knee replacement on Mr. Marshall's right knee.[74] After a three-day hospital stay, Mr. Marshall was discharged on October 22, 2010.[75] Mr. Marshall then had regular follow up visits with Dr. Vermillion.[76] In June 2011, Dr. Vermillion requested and received a physical capacity evaluation of Mr. Marshall from MSPT Carlson.[77] He also obtained x-rays of Mr. Marshall's knee on June 29, 2011.[78]

---

[73] A.R. 316.

[74] A.R. 323, 372.

[75] A.R. 322.

[76] A.R. 314 (November 29, 2010; notation: "doing well" but unable to return to work);

A.R. 313 (December 29, 2010; notation: "improving after [physical] therapy");

A.R. 312, 368 (January 26, 2011; notation: "doing well status post total knee, with residual strength loss," "minimal pain," "able to walk" but "gait still antalgic," has "some swelling, and he is not able to kneel yet," work status noted as unable to return to work for six more weeks, but "improving gradually");

A.R. 311 (March 9, 2011 notation "still having pain in his right knee," with "residual stiffness" and gait "minimally antalgic");

A.R. 310 (April 20, 2011; notation: "pain is decreasing a lot," "able to try to get moving around his yard and using the chainsaw to cut wood," "minimal amount of swelling," and "the patient desires to go back to work," work status: unable to return to work for six more weeks);

A.R. 309 (June 1, 2011; notation: decreased range of motion; orders functional capacity assessment by physical therapist);

A.R. 308, 328 (June 29, 2011 notation: still having knee pain on the right knee, obtains and reviews x-rays);

A.R. 307 (July 27, 2011; notation: mild swelling with decreased range of motion, mild warmth, work status: unable to work for six more weeks).

[77] A.R. 287–289.

[78] A.R. 328.

On July 27, 2011, Mr. Marshall had an appointment with Dr. Vermillion, who observed mild swelling, limited range of motion, mild warmth, and tenderness of the right knee on that date.[79] Dr. Vermillion issued his first of two opinions regarding Mr. Marshall's work-related disabilities.[80] That opinion mirrored the opinions of MSPT Carlson, which are discussed below.[81] Dr. Vermillion released Mr. Marshall to work at that time with restrictions that included no more than two hours of sitting and no more than two hours of standing during an eight hour period, up to 30 minutes walking, and lifting 50 pounds as tolerated. The ALJ did not discuss this opinion in his decision.

On September 7, 2011, Dr. Vermillion again examined Mr. Marshall's knee and determined he had "right knee osteoarthritis, stable after a total joint" replacement. The doctor also found that Mr. Marshall had "reached maximum medical improvement."[82] That same day, Dr. Vermillion opined as to Mr. Marshall's work capabilities, and concluded that he could sit "as tolerated 20-40 minutes with short breaks," stand "as tolerated 20-40 minutes with breaks," walk as tolerated on level surfaces, climb stairs as tolerated, carry 50 pounds intermittently, do minimal kneeling as tolerated, and climb short ladders as tolerated.[83]

---

[79] A.R. 307.

[80] A.R. 337.

[81] A.R. 286–290.

[82] A.R. 334.

[83] A.R. 334.

Mr. Marshall had additional follow up visits with Dr. Vermillion in February 2012 and October 2013.[84]   At the October 2013 visit, Dr. Vermillion referred Mr. Marshall to Nancy Cross, a pain specialist, to address Mr. Marshall's continuing right knee pain.[85] The doctor noted that "radiographs look good and motion is okay," but that Mr. Marshall was experiencing "dull pain most of the time," two to three out of ten on a pain scale, and wanted relief.[86]

The ALJ's RFC concludes that Mr. Marshall is able to perform light work so long as he is able to alternate sitting and standing positions at one hour intervals throughout the day for up to five minutes at a time—a finding that is substantially less restrictive than Dr. Vermillion had opined in September 2011.  The ALJ indicated that he had given only "partial weight" to Dr. Vermillion's September 2011 opinions about Mr. Marshall's work related restrictions for three reasons.  The ALJ found that (1) the doctor "gave no rationale with his opinion," (2) post-surgical x-rays "reveal no abnormalities other than the presence of hardware at the right knee," and (3) the limitations were out of proportion to the doctor's post-surgery examination findings.

Mr. Marshall asserts that Dr. Vermillion's extensive treatment notes in the months following the knee replacement surgery that he performed, along with MSPT Carlson's physical capacities evaluation, provided ample context and rationale to support the doctor's September 2011 opinion.  Mr. Marshall pointed out that the doctor remarked about mild swelling, warmth, and tenderness in Mr. Marshall's right knee in July 2011 and

---

[84] A.R. 305, 570.

[85]  A.R. 570–72 (referral to pain doctor, Oct. 21, 2013).

[86]  A.R. 570–73.

that his right quad muscle tone was still lacking compared to his left leg, although it had improved in September 2011.[87]  The Commissioner responds that the ALJ provided legally sufficient reasons that were supported by substantial evidence as required to discount this treating source's opinion.[88]

The Court agrees with Mr. Marshall.  Dr. Vermillion is a surgeon specializing in orthopedics who performed a total knee replacement on Mr. Marshall's right knee.  As of September 2011, he had regularly treated Mr. Marshall for well over one year.  Moreover, the Court does not find another medical opinion in the administrative record that contradicts Dr. Vermillion's opinions.  Indeed, the ALJ noted that other treating sources' examination records "reveal nothing significantly different than findings noted by Dr. Vermillion."[89]  As such, the ALJ was required to provide clear and convincing reasons for rejecting Dr. Vermillion's opinions.  He did not.

The ALJ's first rationale to accord less than full weight to Dr. Vermillion's opinions—because Dr. Vermillion "gave no rationale with his opinion"—is without merit. Dr. Vermillion had a multi-year treating relationship with Mr. Marshall documented in the record that includes extensive treatment notes, x-ray results, physical therapy prescriptions, drug prescriptions, functional capacity evaluations, and other records. Together, these provide a rationale and a context for Dr. Vermillion's opinions.

The ALJ's second rationale for according only partial weight to Dr. Vermillion's opinions—because post-surgical x-rays did not "reveal abnormalities other than the

---

[87]  Docket No. 10 at 12–13.

[88]  Docket No. 11 at 9.

[89]  A.R. 19; Docket No. 11 at 6.

presence of hardware at the right knee"—is not supported by the objective medical evidence. Setting aside the fact that a total knee replacement is by no means a small medical procedure, the record contains numerous reports of swelling, reduced range of motion, and an antalgic gait. In addition, an April 1, 2013 three-phase bone scan report of Mr. Marshall's right knee revealed "accentuated activity particularly on the blood pool" which "may reflect either a severe stress reaction [or] loosening of the patellar component."[90] Accordingly, the Court finds that the ALJ's assertion that post-surgical examinations did not "reveal abnormalities other than the presence of hardware at the right knee" is unsupported by the record and not a legitimate reason for rejecting Dr. Vermillion's opinion.

Lastly, the ALJ's assertion that Dr. Vermillion's opinion on Mr. Marshall's limitations were out of proportion to the doctor's post-surgery examination findings is unpersuasive. Dr. Vermillion's September 2011 work release restrictions were made when the doctor opined that Mr. Marshall had reached maximum medical improvement. At that time, the doctor noted a limited range of motion (*i.e.,* 0 degrees to 110 degrees), tenderness on flexion, and improved quad tone that was still "lacking" compared to the left leg. In February 2012, Dr. Vermillion noted Mr. Marshall's right knee was still stiff, that he had full extension was possible with trouble past 95 degrees, and mild swelling. His assessment then was right knee osteoarthritis with some residual pain. And in April 2013, the bones scans discussed above were obtained. Again, these medical records contradict the ALJ's assertion that Dr. Vermillion's opinions were out of proportion to the doctor's findings. The Court also notes that if the ALJ found Dr. Vermillion's

---

[90] A.R. 550.

opinions to be dated, then the ALJ should have requested further evaluation and a new opinion from Dr. Vermillion regarding Mr. Marshall's work-related abilities.

In sum, the Court finds that the ALJ did not articulate the requisite clear and convincing reasons, supported by substantial evidence, when he developed an RFC substantially less restrictive than Dr. Vermillion's opinions. And even if the ALJ found that the doctor's opinions were contradicted by the x-ray results, the Court finds that the reasons given by the ALJ for rejecting the doctor's opinions were not legitimate for the reasons discussed above.

*Jennifer Carlson, MSPT*

The administrative record shows that on referral from Dr. Vermillion, MSPT Carlson provided physical therapy to Mr. Marshall from October 10, 2010 to June 22, 2011.[91] In June 2011, MSPT Carlson conducted a physical capacities evaluation, also at Dr. Vermillion's request.[92] MSPT Carlson provided both the results of the evaluation and an opinion of the results to Dr. Vermillion.[93] She opined that Mr. Marshall was limited to: frequently carrying 10 to 35 pounds as well as twisting and reaching above the shoulder level; occasionally lifting 45 to 65 pounds as well as bending, squatting, and climbing; and that he was not able to lift over 75 pounds at all.[94] Initially,

---

[91] A.R. 297, 286.

[92] A.R. 315, 348, 308–309, 297.

[93] A.R. 290. MSPT Carlson indicates in her supplemental opinion that she conducted the sit/stand tolerance test after Marshall reported to her that he did not think he could sit or stand for eight hours.

[94] A.R. 290.

she opined that Mr. Marshall could sit and stand without limitation, and walk for no more than thirty minutes at a time.[95] However, on June 22, 2011, after Mr. Marshall performed a sitting and standing tolerance test, MSPT Carlson issued an addendum that found that Mr. Marshall could tolerate no more than two hours of standing and two hours of sitting during an eight-hour period.[96]

The ALJ gave MSPT Carlson's opinion no weight because he did not find her an acceptable medical source to render opinions on the claimant's limitations, that her opinions were based on the subjective effort and reports by Mr. Marshall, and that she did not indicate what objective evidence she had relied on to form her opinions.[97]

Mr. Marshall asserts that the ALJ failed to consider MSPT Carlson's opinions in conjunction with Dr. Vermillion's September 7, 2011 opinion—as the context of referral and treating relationship requires; that the ALJ committed legal error in finding that MSPT Carlson was not able to provide an opinion about Mr. Marshall's limitations; and that the opinion was based solely on Mr. Marshall's own efforts and self-reporting.[98] The Commissioner responds that the ALJ provided a germane reason for assigning no weight to MSPT Carlson's opinions, *i.e.*, she relied on the subjective complaints of Mr. Marshall—which the ALJ found to be not entirely credible—and cited no objective evidence on which she relied.[99]

---

[95] A.R. 290.

[96] A.R. 286.

[97] A.R. 21.

[98] Docket No. 10 at 14–15.

[99] Docket No. 11 at 11–12.

The Court notes that although SSA regulations explicitly address only how ALJs are meant to evaluate medical opinions (*i.e.,* opinions from "acceptable medical sources," as defined in 20 C.F.R. § 404.1527), the SSA has acknowledged since 2006 that modern healthcare incorporates heavy reliance on healthcare professionals who do not necessarily meet the definition of an acceptable medical source under SSA regulations.[100]   Indeed, the SSA has instructed ALJs that when considering such evidence (including opinions), the same factors used for acceptable medical sources apply to the consideration of all opinions made by medical professionals, even if they are not "acceptable medical sources," because the factors "represent basic principles."[101] The SSA illustrates a situation in which an acceptable medical source and medical source who is not deemed acceptable each provide opinions; in such a scenario the fact that one opinion is from an acceptable source is highly relevant and "may justify giving that opinion greater weight" because the SSA finds acceptable medical sources to be "the most qualified health care professionals."[102]   With this in mind, the Court finds that the ALJ erred in dismissing MSPT Carlson's opinions because she is not an acceptable medical source as defined by SSA regulations.

The ALJ also offered two additional reasons to disregard MSPT Carlson's opinions:  (1) her reliance on Mr. Marshall's effort and subjective reports of pain; and (2)

---

[100] "Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources," Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, 2006 SSR LEXIS 5, (Aug. 9, 2006).  SSR 06-03p does not have the force of law, but it is binding on ALJs and courts defer to the Commissioner's rulings so long as their application does not produce a result that is inconsistent with the statute and regulations.  20 C.F.R. § 402.35 Publication.

[101] SSR 06-03p.

[102] *Id.*

her failure to "provide a rationale as to what objective evidence she relied upon in rendering her opinions."[103]   The Court does not find either reason persuasive.   First, a patient's effort and subjective reports are necessarily a part of any physical capacity evaluation.   And MSPT Carlson specifically noted that she found Mr. Marshall "gave excellent effort" during his physical capacities evaluation.[104]   Second, as Mr. Marshall pointed out, the physical capacitates evaluation itself contains the objective medical findings upon which MSPT Carlson relied.[105]   MSPT Carlson provided a detailed report of her evaluation that included the identification of the weight and repetitions performed for each task.[106]   And MSPT Carlson had treated Mr. Marshall on three prior occasions outside of the physical capacities evaluation and subsequent sit/stand test.[107] Consequently, the ALJ erred in the wholesale rejection of MSPT Carlson's opinions.

   *Dr. Cobden, orthopedic doctor*

   On six occasions between October 2011 and July 2014, orthopedic doctor Dr. Cobden also examined Mr. Marshall.[108]   On October 6, 2011, Dr. Cobden completed a chart review, met with Mr. Marshall, and opined in a permanent partial impairment ("PPI")

---

[103] A.R. 21.

[104] A.R. 289.

[105] A.R. 287–289.

[106] A.R. 287-289.

[107] A.R. 297–298, 295–296, 291–292.

[108] A.R. 394 (Oct. 6, 2011), 395 (April 24, 2012), 396 (April 27, 2012), 397 (June 11, 2012), 552 (Sept. 9, 2013), and 761 (July 14, 2014).   *See also* A.R. 524 (Dec. 21, 1998).

rating that Mr. Marshall had a 25% whole person impairment.[109]   Dr. Cobden also completed "a total and Permanent Disability Pension Questionnaire" on July 14, 2014. There, he concluded that based on Mr. Marshall's spinal stenosis and chronic wrist pain, he was totally and permanently disabled.[110]

The ALJ did not reference Dr. Cobden's 2011 report.  As to the 2014 questionnaire, the ALJ gave "no weight" to Dr. Cobden's opinions on Mr. Marshall's ability to work because the ALJ found the doctor's opinions to be conclusory and unsupported.  The ALJ reasoned that Dr. Cobden had not begun treating Mr. Marshall until approximately two years after the alleged disability onset date of November 2009 and had only seen Mr. Marshall annually.  The ALJ added that in the 2014 questionnaire, Dr. Cobden gave "no indication as to what evidence he relied upon" in reaching his opinions.[111]

Mr. Marshall asserts that the ALJ erred in rejecting Dr. Cobden's opinions.[112]  He maintains that Dr. Cobden's treatment notes reveal the evidence on which the doctor relied to formulate his opinion.[113]   He also argues that Dr. Cobden's opinions are consistent with those of both Dr. Vermillion and MSPT Carlson.[114]  The Commissioner

---

[109] A.R. 394, 332, 334 (maximum medical improvement declared by Dr. Vermillion, Sept. 7, 2011).

[110] A.R. 675 (Total and Permanent Disability Pension Questionnaire, July 14, 2014).

[111] A.R. 21.

[112]  Docket No. 10 at 15.

[113]  Docket No. 10 at 15.  *See, e.g.*, A.R. 394 ("complete chart review was on done on him").

[114]  Docket No. 10 at 16.

responds that the ALJ properly rejected Dr. Cobden's opinions because they were conclusory and unsupported.[115]

The Court finds that although Dr. Cobden was not Mr. Marshall's primary treating source for his chronic right knee or back pain, he had seen him several times from 2011 to 2014 and as such had a treating relationship with Mr. Marshall. The Court notes, however, that some of his visits pertain at least in part to "paperwork," which is indicated as being about Mr. Marshall's worker's compensation benefits and/or disability benefits application.[116] Nonetheless, that merely means that Dr. Cobden could be deemed a "nontreating source"—like a consultative examiner used by the SSA. It does not provide a basis for the wholesale rejection of Dr. Cobden's opinions.[117]

On September 19, 2013, Dr. Cobden met with Mr. Marshall. On that day, Mr. Marshall had decreased range of motion, slight effusion, some medial tenderness and an antalgic gait.[118] Dr. Cobden also reviewed multiple x-rays of Mr. Marshall's knees, right ankle, and spine. At that visit, Dr. Cobden opined that Mr. Marshall was ready to apply for disability benefits since "he no longer can work and can barely move without pain."[119] Dr. Cobden also noted that he was referring Mr. Marshall to a pain clinic for pain management. Dr. Cobden found early degenerative arthritis in Mr. Marshall's right ankle and chronic degenerative changes in the lower back and noted that a total knee

---

[115] Docket No. 11 at 10.

[116] *See* A.R. 397, 552.

[117] 20 C.F.R. §404.1502 (2014). *See supra* at 10.

[118] A.R. 552.

[119] A.R. 553.

replacement in Mr. Marshall's right knee was "in good position and alignment and shows no signs of loosening"—which he also found after reviewing an x-ray from October 2011.[120]   Consequently, Dr. Cobden did not provide his opinions without considering the objective medical evidence.   Additional objective observations are included in his treatment notes.[121]   Moreover, Dr. Cobden conducted the PPI of Mr. Marshall in October 2011, which necessarily provided him with an extensive understanding of Mr. Marshall's body mechanics, including his abilities and limitations at that time.

The Court also finds the fact that Dr. Cobden did not provide treatment to Mr. Marshall until 2011 to be an insufficient basis to reject his opinions.   Dr. Cobden became involved at the time of the PPI according to record before the Court.   While Dr. Vermillion performed the total knee replacement, that does not preclude Mr. Marshall from obtaining treatment from another medical source.   And importantly, no other medical records in the administrative record contradicted Dr. Cobden—and he did not contradict any other doctor.   The ALJ was required to provide clear and convincing reasons to reject Dr. Cobden's opinions.[122]   The Court's review of the record demonstrates that he did not.

The Court finds that the ALJ erred in rejecting Dr. Cobden's opinions.   The *pro forma* use of "conclusory and unsupported" and "no indication of what evidence was relied

---

[120] A.R. 554, 398.

[121] *See, e.g.*, A.R. 552.

[122] *Lester*, 81 F.3d at 830–31, (citing *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1990)), *as amended*.

upon" to reject opinions of acceptable medical sources runs afoul of SSA regulations and policy as well as the applicable case law.

2.    Appropriate Remand

A court may remand a disability benefits case to the ALJ for further administrative proceedings or for an immediate calculation of benefits. A reviewing court "retains 'flexibility' in determining the appropriate remedy."[123] A remand for further proceedings is proper when, despite legal errors, the record is uncertain and ambiguous[124] and further administrative proceedings would serve a useful purpose.[125] "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[126]

In contrast, a remand for an immediate calculation of benefits is warranted when the requirements of the "credit as true rule" are met. Those requirements are met when: (1) that the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; (2) the record has been fully developed and further proceedings would serve no useful purpose; and (3) if the improperly discredited evidence

[123] *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (citing *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014)).

[124] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1104 (9th Cir. 2014).

[125] *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (citing *Garrison*, 759 F.3d at 1020); *see also Burrell*, 775 F.3d at 1141.

[126] *Brown-Hunter*, 806 F.3d at 496 (9th Cir. 2015) (citing *Treichler*, 775 F.3d at 1101).

were credited as true, the ALJ would be required to find the claimant disabled on remand.[127]

Here, the Court has found that the ALJ failed to provide legally sufficient reasons for rejecting certain medical opinions. And if the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled on remand. Nonetheless, the Court finds that further administrative proceedings will serve a useful purpose in this case. There are unresolved factual issues and some unaddressed evidence and opinions that lead this Court to find that an award of benefits is not proper at this time. The extent of Mr. Marshall's physical limitations is not clear from the administrative record before the Court and the SSA is charged with determining disability, not this Court. Moreover, "the touchstone for an award of benefits is the existence of a disability, not the agency's legal error."[128]

On remand, the Commissioner is directed to properly consider the opinions contained within the administrative record, which requires the Commissioner to (1) review the additional medical records in the administrative record—namely Dr. Cross, PT Morgan, and LCSW Lewis—and weigh the opinions and evaluate the evidence contained within them in conjunction with the entire administrative record; (2) evaluate the opinions of Dr. Cobden and Dr. Vermillion using the factors listed in 20 C.F.R. §404.1527(2)(c); (3) consider the opinions of MSPT Carlson and PA Frampton, using the same factors; (4) reevaluate Mr. Marshall's statements pertaining to his symptoms; (5) determine whether to accord Mrs. Marshall's statements greater weight in

---

[127] *Id.* at 494 (citing *Treichler*, 775 F.3d at 1105; *Garrison*, 759 F.3d at 1020).

[128] *Id.* at 496.

light of the reevaluations and new evidence; and (6) determine whether Mr. Marshall's RFC should be modified and if so how that impacts his ability to work.

The ALJ is invited to acquire additional medical records, including an updated physical capacities evaluation and corresponding functional work abilities opinion, as well as follow-up with the treating sources already involved in this case to obtain additional information or clarify any questions that may exist or arise. Likewise, should additional information be available that is not already in the administrative record, Mr. Marshall may submit it to the ALJ for consideration in this remand.

## CONCLUSION

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and are not all supported by substantial evidence. Accordingly, IT IS ORDERED THAT **Docket 1** is **GRANTED IN PART**, the Commissioner's final decision is **VACATED,** and the case is **REMANDED** to the SSA for further proceedings consistent with this decision.

The Clerk of Court is directed to enter judgment accordingly.

DATED this 31st day of March, 2017 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE